UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BECKY MCBETH,

        Plaintiff,

    v.                            Case No. 19-C-544

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER REVERSING DECISION OF COMMISSIONER

Plaintiff Becky McBeth filed this action for judicial review of a decision by the Commissioner of Social Security denying her applications for a period of disability and disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff claims that the ALJ erred in his assessment of her residual functional capacity (RFC), her treating physician's opinion, and her statements concerning her symptoms. For the reasons that follow, the decision of the Commissioner will be reversed and remanded for further proceedings.

### BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits and an application for supplemental security income on November 5, 2015. R. 17. In these applications, Plaintiff alleged disability beginning on November 5, 2015. *Id.* In her disability report, Plaintiff listed the following physical or mental conditions that limited her ability to work: degenerative chronic back pain, degenerative chronic neck pain, complete AV block, migraines once per week that last the entire day, and chronic hip pain. R. 279. After her applications were

denied initially and on reconsideration, Plaintiff requested a hearing before an ALJ. On February 2, 2018, ALJ Jeffrey Gauthier conducted a hearing in Milwaukee, Wisconsin, where Plaintiff, who was represented by counsel, and a vocational expert (VE) testified. R. 39.

At the time of the hearing, Plaintiff was 45 years old and had been living with and at the home of a friend for the past seven years. R. 47. Plaintiff testified she is single and has two adult children. R. 48. She stated she has no income and was on food stamps. *Id*. The highest degree Plaintiff obtained was an associate degree in 2003 to be a medical assistant. R. 50. Plaintiff has a driver's license and said she drives her housemate's car once or twice a month to go to places like Walgreens and her doctor's appointments. R. 48–49.

Plaintiff testified she had not worked for pay or performed any volunteer work since November 5, 2015. R. 50. Previously, Plaintiff had worked as a medical assistant from 2005 to 2015. R. 51–52. Plaintiff said this involved weighing patients and obtaining their vitals as well as desk work and tracking laboratory, radiology, and pathologies. R. 52.

Plaintiff next described her medical conditions. She testified that headaches and migraines were the most disabling. R. 53. Plaintiff said she worked for about two years after the migraines started. *Id*. While she was working during this time, she took Maxalt—medication that made it possible for her to work with the migraines. *Id*. However, Plaintiff said she is building a tolerance to Maxalt and it no longer works as well as before. *Id*. Plaintiff stated that she suffers from about 20 headaches per month; about 2.5 of the headaches per week are migraines. R. 55. She described her migraine symptoms as debilitating and causing nausea, vomiting, and frontal pain above her right eye. R. 55–56. Plaintiff said she receives no warning that a migraine is forthcoming—no aura or floaters. R. 56. Plaintiff testified that all of her migraines cause vomiting, nausea, and sensitivity to light and sound. *Id*. When she suffers a migraine, Plaintiff said she reacts by taking

a Maxalt with a can of Coke and enters a room where she has blackout curtains. *Id*. Plaintiff said her migraine symptoms last six to eight hours and make her sleepy. R. 56–57.

Plaintiff sees a doctor who specializes in neuroglial disorders who she said had recently increased her dose of Depakote, a medicine that she takes twice daily to prevent migraines. R. 57–58. She said this medicine has not been effective, and although she is considering Botox injections to address her migraine symptoms, she has a needle phobia. R. 58.

Plaintiff also testified she has "silent" migraines where she experiences bad vertigo with nausea, but no headache. *Id*. These silent migraines are separate from the 2.5 migraines she experiences per week. *Id*. During a silent migraine, Plaintiff said she feels like the room is spinning and is nauseous for an entire day. R. 59. Plaintiff stated she went to the emergency room the Friday before the hearing for a silent headache. *Id*. She testified she was experiencing vertigo at the time of the hearing. *Id*.

Using the computer at her last job made her headaches and migraines worse, according to Plaintiff. R. 61. At home, Plaintiff described mostly using her cellphone for checking email and a laptop computer about once a month. R. 61–62.

Plaintiff said her next most painful medical condition is her neck pain, which is caused by arthritis and bone spurs. R. 62. In July 2016, Plaintiff said she underwent a cervical fusion with a corpectomy. R. 62–63. She does not believe the surgery was successful because she still has neck pain. R. 63. Plaintiff said she did not see benefits from physical therapy and had taken oxycodone at one dosage for four years—a dosage which was increased the month before the hearing. R. 64–65. Plaintiff testified that her doctor had spoken with her about rebound headaches associated with medication overuse. R. 65. Plaintiff said her doctor also had her try cutting out all caffeine for 100 days, but this also failed to improve her condition. *Id*. When Plaintiff takes

oxycodone, she said it reduces her neck pain from a 10 to about a 7; about three times per week she experiences pain at a 10. *Id.* To control her pain, Plaintiff said she uses muscle relaxers, anti-inflammatory medication, and specified Gabapentin. R. 67. She denied using illegal narcotics, including marijuana. *Id.*

Plaintiff also described her low back pain and left hip pain. *Id.* She underwent a fusion in 2007 for her low back pain and also had a laminectomy in 2008 and did physical therapy. R. 67–68. Plaintiff said she was able to work after these surgeries, but her condition has since worsened. R. 68. She also testified about a left hip surgery she had in 2009. *Id.* Plaintiff said her doctor is unsure about performing another left hip surgery because the likelihood of success of another arthroscopic surgery is minimal and the total damage cannot be assessed because Plaintiff has a pacemaker and cannot undergo an MRI. R. 74. She said she underwent a breast reduction surgery in December 2017 hoping that it would reduce her pain. R. 78. At the time of the hearing, she was still recovering from this procedure but did not believe it improved her neck pain. *Id.*

Plaintiff said she spends most of her day watching television and listening to books. R. 69. She testified that she probably spends five or six hours a day watching television and about the same listening to books. R. 70. Plaintiff listens to books instead of reading them because she said her range of motion is limited. R. 77. When she is not watching television or listening to books, Plaintiff said she attempts to clean up the house; she sits at the sink to wash dishes and sits on the sofa to vacuum. R. 71. Plaintiff said her housemate brings her laundry upstairs from the basement when it is complete. *Id.*

Plaintiff testified that, even if her migraines and headaches subsided, her back pain and neck pain would prevent her from working as a medical assistant because she could not sit or walk for extended periods of time. R. 72. Plaintiff said she lies down for most of her day. R. 72–73.

4

She described spending 12 hours a day in bed, 3 hours sleeping at night and 9 or 10 hours during the day. R. 73. The remaining hours of the day are spent sitting in a recliner. *Id*. Plaintiff said she does do her physical therapy exercises at home, which take about 35 minutes per day. *Id*. However, she said the exercises do not help her. *Id*.

During the hearing, the ALJ posed a hypothetical question to the vocational expert (VE), asking whether an individual (similar to Plaintiff in age, education, and work experience) with the restrictions outlined by Plaintiff's RFC would be able to perform the relevant past work that Plaintiff had performed. R. 81. The VE testified that Plaintiff would be able to do her past relevant work as actually performed. *Id*. The VE stated that this hypothetical person would also be able to work as a sorter or an inspector. R. 82. The ALJ posed a second question to the VE, adding that the person presented in the first hypothetical would be absent from work two days every month in a 12-month period. *Id*. The VE said these additional limitations would be work preclusive. *Id*.

In a fifteen-page decision dated June 20, 2018, the ALJ concluded that Plaintiff is not disabled. R. 17–31. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 5, 2015. R. 20. At step two, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar and cervical spine, left hip osteoarthritis, right knee osteoarthritis, migraine headaches, cardiac dysrhythmia, status post pacemaker implant, and clinical obesity. *Id.* At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 22.

The ALJ proceeded to assess Plaintiff's residual functional capacity (RFC). He found that Plaintiff had the RFC to perform sedentary work except that she has the following additional limitations: "She can never climb ladders, ropes, or scaffolds. The claimant may occasionally climb ramps or stairs. She can occasionally stoop, kneel, crouch, and crawl." R. 23–24. At step four, the ALJ concluded Plaintiff was capable of performing past relevant work as a medical assistant. R. 29. Alternatively, at step five, the ALJ accepted the testimony of the VE and found that there were a significant number of jobs in the national economy that Plaintiff could perform, including a sorter or inspector. R. 30. Accordingly, the ALJ concluded that Plaintiff was not disabled. R. 31. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. 1.

## LEGAL STANDARD

The Commissioner's final decision will be upheld "if the ALJ applied the correct legal standards and supported [his] decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. § 405(g); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). The ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion[s]." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citing *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); and *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998)).

6

The ALJ is also expected to follow the Social Security Administration's rulings and regulations. Failure to do so, unless the error is harmless, requires reversal. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); and *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Plaintiff advances several reasons why the ALJ's decision is flawed and must be reversed. She contends that the ALJ erred in his assessment of her RFC by failing to include the limitations attributable to her migraine headaches, vertigo spells status post cervical fusion, upper extremity deficits, and side effects of her medication. Plaintiff also contends that the ALJ erred in assessing the opinion of Dr. Sara Nolen, her primary care physician, and in assessing her statements concerning the limiting effects of her symptoms.

Before deciding whether the ALJ erred in his assessment of Plaintiff's RFC, it is of course first necessary to look to the functional limitations caused by Plaintiff's impairments. A claimant's RFC is the most the claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). An ALJ errs in assessing a claimant's RFC if he fails to include all of the claimant's limitations supported by the medical record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). On the other hand, an ALJ does not err in failing to include limitations he reasonably concludes are not supported by the evidence.

7

Plaintiff is correct that the RFC formulated by the ALJ in this case did not include functional limitations caused by her migraine headaches, her dizziness/vertigo, her upper extremity deficits (other than the 10-pound lifting limitation), and the side effects of her medications. A careful reading of the ALJ's decision makes clear that this is because the ALJ did not find that these impairments caused functional limitations beyond those he included in the RFC. The ALJ provided an explanation why he did not find additional limitations as to each of the impairments Plaintiff cites, with the exception of her dizziness/vertigo, which the evidence suggests began after her July 2016 cervical fusion. The ALJ did not find her vertigo to be a severe impairment separate from her migraine headaches. R. 20. Yet, as Plaintiff points out, the record contains significant evidence that Plaintiff experienced repeated episodes of vertigo and/or dizziness. This includes:

- August 2016: presents to the emergency room with lightheadedness, vomiting, and a constant dizziness (i.e. sensation of the room spinning), R. at 907;

- August 2016: presents to the emergency room again with constant dizziness, having lasted a week; McBeth is diagnosed with benign paroxysmal positional vertigo, R. at 1105, 1113;

- August 2016: Dr. Nolan notes dizziness for the last eleven days; she diagnoses vestibular dizziness, R. at 1182, 1185;

- August 2016: Dr. Nolan notes ongoing dizziness and no improvement with prescribed medications, R. at 1191;

- September 2016: Dr. Potts notes episodes of nausea/vomiting, lightheadedness, and dizziness; episodes are noted to occur every four to five days, lasting the entire day; he opines that McBeth's vertigo is likely related to a posterior circulation migrainous process, R. at 1208;

- September 2016: Dr. Wermuth notes daily, constant lightheadedness, dizziness, spinning that is usually accompanied by nausea; Dr. Wermuth diagnoses dizziness of uncertain significance but opines that her symptoms may be migraine-related, R. at 1222, 1227;

- September 2016: Dr. Nolan notes continued dizziness, R. at 1234;

8

- October 2016: Dr. Dhala notes frequent vertigo and dizziness spells, R. at 2144;

- October 2016: physical therapy notes indicate increased dizziness and that McBeth required increased breaks to sit or stand due to dizziness, R. at 2423;

- October 2016: Dr. Potts notes low level of daily dizziness but that, every four to five days, McBeth's dizziness is more severe, R. at 2357-58;

- December 2016: Dr. Potts notes no improvement in dizziness; notes that she has a vertigo episode every five days or so, R. at 2381-84;

- February 2017: Dr. Heffez notes vertigo since surgery (daily low dizziness and vertigo every four to five days, preceded by nausea and vomiting), R. at 2582;

- May 2017: Dr. Heffez notes vertigo since surgery, R. at 2577;

- February 2018: McBeth testified at her hearing that she experiences "silent migraines," which she explains are episodes where the room is spinning with associated nausea; she notes that these episodes can last the entire day, R. at 59.

Pl.'s Br., Dkt. No. 12, at 11.

It may be that the ALJ attributed Plaintiff's vertigo/dizziness to her migraine headaches and intended to treat them together but that is not clear from the decision. Instead, the ALJ appears to have overlooked a line of evidence that required analysis and evaluation in order to properly determine Plaintiff's RFC. The ALJ is required to assess a claimant's RFC "based on all the relevant evidence" in the record, including severe and non-severe impairments as well as medical and non-medical evidence. § 404.1545(a), (e). In evaluating the record, ALJs are "not permitted to cherry-pick evidence from the record to support their conclusions, without engaging with the evidence that weighs against their findings." *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018). The case must be remanded to allow the Commissioner to consider and assess this evidence.

Plaintiff also challenges the ALJ's finding that her migraine headaches and side effects of her medications did not also limit her functional capacity. The ALJ offered several reasons why

9

he concluded that Plaintiff's claims as to the frequency and severity of her migraine headaches were not supported by the evidence. R. 27–28. The ALJ noted Plaintiff's ten-year history of being able to work with migraines, the incongruity of an increase in migraine headaches allegedly triggered by neck pain even though neck pain decreased after surgery, the absence of any abnormalities noted on a complete neurological workup, and Plaintiff's failure to follow through on treatment recommendations to reduce use of analgesics and caffeine and try Botox injections. Evidence that Plaintiff tried a 100-day abstinence from caffeine (R. 65) and reduced her use of analgesics with no improvement (R. 458) warrants reconsideration of this issue on remand as well.

The fact that Plaintiff worked for 10 years despite having symptoms is also a questionable reason to discount the severity of her symptoms on its own. The Seventh Circuit has criticized this treatment of a claimant's work history: "To the contrary, we have thought it 'fortunate' that persons eligible for benefits sometimes wait until a real need arises before they 'feed at the public trough.'" *Czarnecki v. Colvin*, 595 F. App'x 635, 644 (7th Cir. 2015) (quoting *Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir. 1996)). The ALJ's dismissal of Plaintiff's symptoms in light of her work history fails to consider that her symptoms may have changed or worsened over time—or that she first attempted treatment to no avail. In fact, Plaintiff stated that despite her history of migraines, the headaches that she presented with in 2015 were "quite different." R. 493. It was May 2017 when Dr. Potts noted that Plaintiff's continued migraines were "difficult to control." R. 2330. Throughout late 2016 and 2017, Dr. Potts noted continued headaches and made adjustments to her medication to try to find something that worked better. R. 2357, 2359, 2413. The ALJ should address these concerns on remand.

**CONCLUSION**

For the reasons above, the Commissioner's decision is **REVERSED** and **REMANDED** to the Agency pursuant to 42 U.S.C. § 405(g) (sentence four). Although the court has concluded that remand is warranted based on the ALJ's failure to assess the medical evidence of Plaintiff's vertigo/dizziness, the Commissioner should also address Plaintiff's claims that the ALJ did not properly assess the limiting effects of her migraine headaches. Further consideration of these and other claimed errors on remand will aid in reaching a final resolution of the case and avoid further remands in the future. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of November, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

11